**In re John R. KLEIN (Deceased); by Helen B. KLEIN, Executrix; Michael J. Noone and Kermit E. Stahl.**

No. 92–1420.

United States Court of Appeals,
Federal Circuit.

March 11, 1993.

John F. McNulty, Paul & Paul, Philadelphia, PA, argued, for appellant.

James T. Carmichael, Associate Sol., Office of the Sol., Arlington, VA, argued, for appellee. With him on the brief, was Fred E. McKelvey, Sol. Of counsel, were John W. Dewhirst, Lee E. Barrett, Richard E. Schafer and Albin F. Drost.

Before RICH, Circuit Judge, BENNETT, Senior Circuit Judge, and NEWMAN, Circuit Judge.

RICH, Circuit Judge.

This appeal is from the January 28, 1992, decision of the United States Patent and Trademark Office (PTO) Board of Patent Appeals and Interferences (board) affirming the examiner's final rejection of appellants' application serial No. 07/174,023, filed December 13, 1990, for a design patent on a design for a roof or siding shingle, request for reconsideration denied March 18, 1992. We reverse.

The sole ground of rejection is that the claimed designs[1] would have been obvious under 35 U.S.C. § 103 in view of the disclosures of the following references:

Overbury   U.S. Patent 1,150,298   Aug. 17, 1915
Johnston   U.S. Patent 2,096,968   Oct. 26, 1937

The real party in interest as disclosed by the briefs is CertainTeed Corporation, of Valley Forge, PA.

■ The sole issue before this court is whether the board erred in finding appellants' design obvious under § 103. Obviousness is a question of law based on underlying facts and our review is de novo when the issue before us is whether a question of law has been correctly decided. *In re Woodruff*, 919 F.2d 1575, 1577, 16 USPQ2d 1934, 1935 (Fed.Cir.1990) (this court reviews obviousness determinations by the PTO de novo); *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1440, 221 USPQ 97, 108 (Fed.Cir.1984) (the tests for determining the validity of a design patent issued pursuant to 35 U.S.C. § 171 are identical to those for determining the validity of a utility patent issued pursuant to 35 U.S.C. § 101, and thus § 103 and the case law interpreting this statute apply with equal force to a determination of the obviousness of either a design or a utility patent).

The board correctly stated that the single claim covers plural alternative embodiments and that the § 103 rejection is proper if the prior art demonstrates the obviousness of any one of them, citing its decision in *Ex parte Appeal No. 315–40*, 152 USPQ 71 (1965). The board then chose appellants' embodiment shown in Figs. 5 and 6, reproduced below, as the basis of its decision.

---

[1] While appellants' application contains the prescribed single claim to "The ornamental design for a Shingle as shown and described," the drawings depict three slight variations on a single basic design. Therefore, we refer to designs in the plural. No objection has been made to this not uncommon practice. The form-of-claim requirement is in 37 CFR 1.153(a).

Fig. 5

Fig. 6

The application as amended describes these figures thus:

Fig. 5 is a front elevational view of a shingle of a third embodiment showing our new design.

Fig. 6 is an end elevational view thereof.

As is usual in design applications, there is no description other than the drawings. It should be noted that appellants' shingle, more appropriately designated a shingle strip in this art, consists of two layers, a top layer of full width containing slots, at the bottom of which are V-shaped notches, which divide the strip into four tabs representative of individual shingles. The back layer, on the right in Fig. 6, is half the width of the shingle strip, is notched but unslotted, and so mounted on the top layer that the back layer notches are offset to the right of the front layer notches, as shown. The back layer underlies all of the slots.

The differences between the three embodiments are that in the Figs. 1–2 shingle the 1st and 3d tabs are slightly shorter than the 2d and 4th, exposing a little more of the back layer at their ends and in the Figs. 3–4 version the back layer lower edge is cut so that it extends slightly more below tabs 1 and 3 than it does below tabs 2 and 4, all four top layer tabs being the same length, as they are in the Figs. 5–6 version. These drawings are below.

_Fig. 1_    _Fig. 2_

_Fig. 3_    _Fig. 4_

The PTO position as expressed by the board is that Overbury

discloses a shingle design in Figure 3 that is essentially the same as the embodiment shown in Figure 5 of the appellants' drawings. That is to say, Figure 3 depicts a shingle with darker lines on the bottoms and right sides of the tabs as compared with the left sides of the tabs giving an offset appearance like that sought by the appellants.

Reproduced below are all of the figures of Overbury's drawings showing the appearance of his shingle strips.

F. C. OVERBURY.
SHINGLE STRIP.
APPLICATION FILED MAR. 1, 1913.

This 1915 patent to Flintkote Manufacturing Company as assignee of Overbury is a utility, not a design, patent. Its specification explains that theretofore waterproof roof coverings of the impregnated, mineral-coated felt type had been applied in sheet form which tended to buckle. "I have found," says Overbury, "that by cutting the sheet crosswise into strips and forming the shingle-like or tile-like projections thereon, to extend in the general direction of the fibers, I am able to prevent any material bending or buckling of the strips and the tabs thereof when laid." In the drawings, e is a sheet of roofing, f, g, h are cuts in the sheet to form the slots n, thus forming the shingle tabs m. Strips k are cut from the sheet along the dotted line j. The description of Fig. 3 is that it "shows a single strip having different shaped tabs."

In addition to what we have quoted above from the board's opinion, the board made further statements about Overbury's disclosure. It said, "the Overbury shingle clearly gives an offset appearance." And in its brief opinion denying reconsideration the board said, "[L]ike the appellants, Overbury blackens the left side of each notch more than the right side." Nevertheless, it neither found Overbury to anticipate appellants' design nor based the obviousness rejection on Overbury's disclosure alone; it based it on Overbury in combination with Johnston, as did the examiner, apparently because of a felt need to do so.

Before turning to Johnston, we will state our views on the board's use of Overbury. We find the board's statements about what Overbury's drawings disclose wholly unjustified. It is in a class with wishful thinking. We cannot find an "offset appearance" or "blackened" left sides of notches. All Overbury's drawings show—and the drawings speak louder than words—is two-dimensional outline shapes of his shingle strips, which are of only single thickness. Appellant's designs are produced from double layers of material, among other things.

The board said, as sole justification of its position, that there are "darker lines on the bottoms and right sides of the [Overbury] tabs as compared with the left sides giving an offset appearance." Even if such darker lines can be perceived, appellants argued to the board, as they do here, that this is simply a conventional drafting practice. The board said, "We disagree." We, however, agree. For one reason, at the time Overbury's application was pending, March 1—August 17, 1915, there was a Patent Office Rule for drawings stating, in relevant part:

> Heavy lines on the shade sides of objects should be used, except where they tend to thicken the work and obscure letters of reference. The light is always supposed to come from the upper left-hand corner at an angle of forty-five degrees.

*Rules of Practice of the United States Patent Office,* revised July 17, 1907, Ninth Reprint Dec. 1915, Rule 52(4). The rule is still in effect today. It reads:

> Heavy lines on the shade side of objects should preferably be used except where they tend to thicken the work and obscure reference characters. The light should come from the upper left-hand corner at an angle of 45°.

37 CFR 1.84(d)(2) (1992). The rule has existed for over 100 years and is, indeed, conventional drafting practice in making patent drawings, indicating nothing except where the light is supposedly coming from.

In using Overbury as prior art, the board has magnified a drafting practice, not only common but required in patent drawings, found in a utility patent, into an alleged suggestion for an ornamental design through the exercise of hindsight. We can agree that Overbury's Fig. 3 shows a shingle strip having a similar outline configuration to appellants' top layer with tab-producing slots terminating in ninety-degree notches at their open ends, but this is only one element of the designs sought to be patented. Appellants' admittedly novel appearance is produced, however, by the notched second or under layer of darker shade, the notches of which are offset to

the right with respect to the notches of the top layer so as to produce a three-dimensional shading effect and suggest a greater lower edge thickness. The examiner admitted in his Answer before the board that even the hypothetical shingle strip which he postulated from a combination of Overbury and Johnston "is not identical to the claimed design in all details." He then applied an erroneous standard of patentability which he referred to as "distinctiveness," citing *In re Lapworth*, 451 F.2d 1094, 172 USPQ 129 (CCPA 1971) wherein the CCPA affirmed a § 103 rejection of a design for a sailboat. The term "distinctiveness" was used by the board in a passage quoted in the court's opinion. Although the court affirmed the *decision* of the board, the court affirmed a rejection for obviousness under § 103, not the language in the quoted board *opinion*. The test under § 103 is obviousness, not distinctiveness. As this court said in *In re Cho*, 813 F.2d 378, 382, 1 USPQ2d 1662, 1663 (Fed.Cir.1987),

> To support a rejection of a design patent application under 35 U.S.C. § 103, the teachings of the references must be such as to have suggested the overall appearance of the claimed design. *In re Rosen*, 673 F.2d [388] at 390, 213 USPQ

[347] at 349 [ (C.C.P.A.1982) ]. Thus, if the combined teachings suggest only components of the claimed design but not its overall appearance, a rejection under section 103 is inappropriate.

It is clear to us that the examiner looked to Johnston, by hindsight, for components that he observed in appellants' designs. He said in his answer, "Johnston shows the wide blackened edges to be old in the art." That was a repetition of what he said in his initial rejection where it was prefaced by this observation:

> The general overall appearance of the Roof or Siding Shingle is essentially shown by Overbury, except that Overbury does not show the wide blackened edges.

Of course, appellants' shingle strips do not have "wide blackened edges." They have an underlayer of darker shade which is so located as to be visible through the slots of and below the edges of the upper layer, unlike anything seen in either reference.

It is not entirely clear to us what the board relies on Johnston for. The only drawing the board refers to is Fig. 3, which is reproduced below together with Figs. 5 and 6.

Like Overbury, Johnston is a utility patent. What Fig. 3 shows is a shingle strip with *simulated* shingles of varying width produced by applying asphalt lines to the face of the strip and coating them with adhered mineral granules to form ridges 21. There are no actual slots or separated tabs. Fig. 3 is referred to as showing a "sawtooth"

shingle strip having lines or areas on the face of the strip and "beaded" edges, as shown at 13 in Fig. 5. Optionally, Johnston may put beads 23 on the back of the strip as shown in Fig. 6 so that the intervening strip segments sag when applied to the roof. We see no resemblance of anything in this reference to appellants' designs. The board, however, said that Johnston has "heavy blackened edges" which might be applied to the tabs of Overbury and that Johnston Fig. 3 gives an "offset appearance." Where the offset is or what is offset, the board does not say, nor do we see it.

In sum, observing Overbury and Johnston, separately or in combination, we do not find the necessary suggestion of appellants' designs. The decision of the board affirming the examiner's rejection under § 103 is therefore *reversed*.

REVERSED.